UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Pace Mechanical Services, Inc.,
a Michigan corporation,

       Plaintiff(s),

v.

Mestek, Inc., a foreign corporation,

       Defendant(s).

_____/

Case No. 02-74869

Honorable Nancy G. Edmunds

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Findings of Fact

1.      Mestek and plaintiff Pace Mechanical, Inc. ("Pace") entered into a contract for Mestek to sell and Pace to purchase radiant cooling panels to be installed on the S.T. Dana renovation project (the "Project") at the University of Michigan.  (Defendant's Exhibit 1.)

2.      The terms of the contract appear in a purchase order Pace sent to Mestek, as revised by Mestek's representative Michael O'Rourke with handwritten notations to the purchase order.  Mr. O'Rourke signed the purchase order with his handwritten changes and added a notation by his signature that it was "in accordance with Sterling Standard Terms and Conditions." He then returned it to Pace. (Defendant's Exhibit 1; O'Rourke testimony.)  Pace did not object to the handwritten terms added by Mr. O'Rourke, and instructed Mestek to begin shipping the panels. (O'Rourke testimony.)

3.      One of the components Mestek supplied under the purchase order was material to connect the panels to the building's water pipes.  Mestek's original shop drawings depicted this material as coiled copper tubing, which the installation contractor (Pace) would cut to length at the site.  (Plaintiff's Exhibit 5.)  In a meeting held in or around July of 2001, Michael O'Rourke of Mestek suggested that a different type of copper material would be easier to install, namely lengths of copper tubing extruded in a twisted pattern to provide flexibility (the "Connectors").  (O'Rourke testimony.)  Douglas Lowe, Pace's representative at the meeting, concurred with the suggestion to switch to the Connectors.  (O'Rourke testimony; Plaintiff's Exhibit 3.)  Mestek subsequently revised its shop drawings to include the Connectors.  (Plaintiff's Exhibit 6.)  Mestek submitted those drawings for approval, and they were received without any objections from Pace or any other party connected with the Project.  (O'Rourke testimony.)

4.      The panel manufacturer, Twa Panel Systems ("Twa") supplies the Connectors to approximately 500 installation jobs per year.  (Richard testimony.)  The Project at issue in this case was the only time that Adrian Richard, who acted as a field troubleshooter for Twa, had ever encountered any complaints about leaks.  (*Id.*)  Mestek had used the Connectors "without incident for approximately 8 years" prior to their installation on the Project.  (Defendant's Exhibit 8.)  Mestek tested the Connectors and found they withstood pressure of 600 pounds per square inch.  (Defendant's Exhibit 9.)  In the mechanical contracting industry, material similar to the Connectors is used for gas lines in residential and commercial applications.  (Hilf testimony.)  The Connectors had a longer expected service life and cost less than the steel braided rubber hose which was considered as an alternative to the Connectors for the Project.  (Exhibit 2 to

2

Timmons Deposition; O'Rourke testimony.)  Mestek was not asked to supply steel braided rubber hose until after leaks had occurred on Phase A of the Project. (O'Rourke testimony.)

5.      The Project's architect, acting on behalf of the owner, The University of Michigan ("University"), directed that a mock-up be constructed to show how the panels would be installed in the building.  Mestek furnished sample panels, which Pace installed.  Mestek arranged to have Tom Paulantonio, a contractor with prior experience installing the panels, oversee Pace's installation of the mock-ups.  (O'Rourke testimony; Hilf testimony.)

6.      Under the parties' purchase order, the material Mestek furnished "was subject to the approval of the…engineer."  Sean Timmons, the Project's consulting engineer, expressed concern that if the panels were lowered for maintenance in the configuration installed on the mock-up, problems could occur because the Connectors were:  (i) too short and (ii) "squashed" into place.  (Timmons Deposition at page 21; and Timmons Deposition Exhibit 1.)

7.      Mr. Timmons communicated his concern to Twa.  Mr. Timmons recommended:  (i) the use of longer Connectors and (ii) that the Connectors be installed in a spiral configuration, which would allow the panels to be raised and lowered without undue stress on the Connectors or other piping components.  (Timmons Deposition at page 17; Defendant's Exhibit 3.)  Twa concurred with Mr. Timmons.  (Defendant's Exhibit 3.)  Mr. Timmons concluded that so long as his recommendations were followed the Connectors were acceptable for use on the Project.  (Timmons Deposition at page

22.) Mr. Timmons instructed that Twa and Mestek train Pace's field personnel to install the Connectors with the spiral configuration. (Defendant's Exhibit 3.)

8. In accordance with the engineer's requirements, Mestek supplied longer Connectors for installation on the Project. (Hilf testimony.) Mestek also arranged and paid to send Tom Paulantonio to the Twa factory in Alberta, Canada to review a mock-up of the recommended installation method and then to the job site to train Pace's employees to install the panels. (O'Rourke testimony.) Mestek also furnished Pace photographic directions from the mock-up at the Twa factory that showed how to install the Connectors in the spiral configuration. (Defendant's Exhibits 5 and 6.) Pace found the training and instructions satisfactory. (Hilf testimony.) Pace agreed that its workers were capable of installing the Connectors as instructed, and that doing so would satisfy Pace's contractual obligation to perform its contract in a "workmanlike" manner (Hilf testimony).

9. Installation of the panels on a portion of the Project called "Phase A" took place from January 14, 2002 through April 4, 2002 and required 2093.5 man hours. (Hilf testimony; Exhibit B to Defendant's Exhibit 15.) During that time, Mestek received no complaints from Pace concerning the Connectors or any difficulties with installing them. (O'Rourke testimony.)

10. After installation of the panels in "Phase A," the building's cooling system was filled with water. At that point, Pace complained that leaks appeared in several rooms. (Hilf testimony; O'Rourke testimony.)

11. Mestek arranged and paid for two Twa employees, Adrian Richard and Delaney Richard, to travel to the job site to inspect the reported leaks. (Richard

testimony.)  Adrian Richard was familiar with the Connectors and had prepared the mock-ups of the installation method at Twa's factory.  (*Id.*)

12.     When they arrived at the site, Pace gave the inspectors a list of rooms where Pace claimed leaks had been discovered.  (Defendant's Exhibit 12, document titled "ST Dana Phase A Panel Leaks"; Richard testimony.)  The inspectors examined how the panels had been installed at each of those locations, and throughout the remainder of the building as well.  (Richard testimony.)   The inspectors documented their work both in writing and with photographs.  (Defendant's Exhibits 11 and 12; Richard testimony.)  The inspectors concluded that in areas where they saw signs of leaks, the apparent cause of the leaks was defective installation work by Pace.  (*Id.*) The inspectors' photographs of examples of this defective work showed:  (i) cracks in the Connectors that had been excessively twisted or crimped during installation because they were not formed in the recommended spiral configuration (Defendant's Exhibits 11C and 11E) and (ii) other Connectors not installed in the recommended configuration, although no cracks were visible.  (Richard testimony; Defendant's Exhibits 11F and 11G.)  The inspectors also found two examples where a panel leaked because Pace's installers had left a plug hole open.  (Richard testimony.)  The inspectors were able to easily locate and examine these conditions by standing on a ladder and looking into the area between the installed panel and the ceiling.  (Richard testimony.)

13.     The inspectors found no evidence of leaks in areas where panels had been properly installed.  (Richard testimony.)

14.     In June 2002, a meeting was held on the site to discuss the Phase A installation.  At that meeting, Mr. Timmons, the Project engineer, examined a broken

2:02-cv-74869-NGE   Doc # 61   Filed 09/22/05   Pg 6 of 12   Pg ID 526

Connector that had been removed from the building and brought into the meeting.  He

concluded that the break occurred because the Connector had been "shoved up to the

ceiling" instead of being "spiral wound" when installed.  (Timmons Deposition at page

21.)  Mr. Timmons explained that as a result, "the soft copper was crimping on itself and

shearing at some of the stress points."  (*Id.*)  Mr. Timmons continued to believe the

Connectors were appropriate for use on the Project, and concluded that the incidence of

leaks resulted from Pace's improper installation.  (Timmons Deposition at page 30;

Exhibit 1 to Timmons Deposition.)

15.     The architect and the University of Michigan issued a contract change

directive ("CCD") requiring that the damaged Connectors be replaced with steel braided

rubber hose and agreeing to pay the extra cost for this change.  (Exhibit 3 to Timmons

Deposition.)  The University did not reject or disapprove the Connectors.  (Timmons

Deposition at page 23.)  The Connectors that had not been cracked were left in place.

(*Id.* at page 31.)

16.     A total of 330 Connectors were installed on Phase A. (Hilf testimony)

Pace claimed that of this total there were 28 leaks.  Pace's written list of the leaks

attributed five leaks to cracked Connectors.  (Plaintiff's Exhibit 16, "Leak Summary.")

Pace provided no oxplanation for any of the cracks.  Pace also did not introduce

evidence specifically linking any defect in the Connectors to any of the remaining 23

leaks, even though Pace claimed to have found and repaired all of the leaks.  Pace did

not describe any specific conditions (e.g., broken solder joints, broken pipes, cracked

Connectors) giving rise to any of those 23 leaks.

17.     A number of factors unrelated to the Connectors could have caused the 23 unexplained leaks.  Pace admitted that three to six leaks would ordinarily be expected on any installation of this size, presumably because some mistakes are bound to happen.  (Hilf testimony.)  The Twa inspectors found two open plug holes that leaked. (Richard testimony.)  Corrosion may also have caused leaks.  (Hilf testimony.)  It was recognized early in the Project that the "flux" material used in the soldering process could corrode the pipes and cause leaks if there were a delay of more than 30 days between soldering the main water piping and when the system was filled with water. (Plaintiff's Exhibit 3; Hilf testimony.)  In this case over six months elapsed between when the supply and return piping was soldered and when water was finally put into the pipes.  (Hilf testimony.)  Pace did not rule out the resultant corrosion as a cause of leaks.  Also, other trades (e.g., the ceiling installer) worked around the installed pipes (Hilf testimony) and could have damaged them.

18.     Pace could have discovered the leaks prior to when the system was filled with water by checking the installed panels through:  (i) pneumatic pressure testing; and (ii) visual inspections.  There was no evidence that Pace did either type of inspection. The Twa inspectors found problems such as cracked Connectors and open plug holes in plain view.  (Richard testimony.)  Had Pace tested and inspected, its repair costs would likely have been minimal, because the leaks could have been quickly located and corrected while Pace's installation crews were still mobilized on Phase A, and before the University occupied the building.

## Conclusions of Law

7

Pace's sole count against Mestek with respect to the Connectors sounds in breach of contract, and alleges:

> 20.    [Mestek] furnished radiant ceiling panels with flex connectors that were non-conforming and not acceptable to the owner.
>
> 21.    The failure to provide radiant ceiling panels with acceptable flex connectors was a breach of [Mestek's] contract with Pace.
>
> 22.    As a result of this breach, Pace was required to spend substantial sums to meet the contract requirement and provide the owner with radiant ceiling panels containing acceptable flex connectors.

Pace's claim against Mestek is governed by the Article 2 of the Uniform Commercial Code.  Specifically, M.C.L. 440.2714 provides:

> 440.2714. Accepted goods; buyer's damages for breach
>
> Sec. 2714. (1) Where the buyer has accepted goods and given notification (subsection (3) of section 2607) ***he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach*** as determined in any manner which is reasonable.
>
> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.
>
> (3) In a proper case any incidental and consequential damages under the next section may also be recovered.

(emphasis added).

The burden is on Pace "to establish any breach with respect to the goods accepted." M.C.L. 440.2607. Thus, in order to recover from Mestek under M.C.L. 440.2714(1), Pace must show both that the connectors were nonconforming, and that the nonconformity caused a "loss" in the "ordinary course of events." *See, e.g., Fargo Mach. & Tool Co. v. Kearney & Trecker Corp.*, 428 F. Supp. 364, 382 (E.D. Mich. 1977).

The evidence in this case shows that the Connectors conformed to the contract. Under the purchase order, the material furnished by Mestek was subject to approval of the Project engineer. Sean Timmons, the engineer for the Project, testified unequivocally in his deposition that so long as they were properly installed, the Connectors were an acceptable material. No evidence was presented that the Connectors could not be installed pursuant to Mr. Timmons' recommended spiral configuration. To the contrary, Pace acknowledged that the procedure was a "workmanlike" method that its employees were capable of performing. There was also no evidence that the University had rejected the Connectors. Mr. Timmons testified that there were no such objections from the University. The Connectors were clearly reflected on Mestek's shop drawings. The drawings were received without objection.

Pace also did not carry its burden of showing that defects in the Connectors caused its losses. Pace identified only five leaks resulting from Connectors that had broken. However, the testimony of Mr. Timmons and Mr. Richard attributed the breaks they observed to improper installation. No other explanation was offered as to any particular break. Pace also did not describe any specific causal mechanism for any of the remaining 23 leaks. Given that Pace's employees located and repaired each of the

9

leaks, Pace should have been able to introduce evidence pointing to the actual causes of the leaks, such as describing which particular components had failed and how they had failed.  Under the circumstances, it may be presumed that the evidence of what actually leaked and why would have been unfavorable to Pace.  *Dowagiac Mfg. Co. v. Schneider*, 181 Mich. 538, 541; 148 NW 173 (1914).

The Court cannot determine causation based merely on speculation.  *Sullivan Industries v. Double Seal Glass Co., Inc.*, 192 Mich. App. 333; 349-350; 480 NW2d 623 (1991).  "To sustain [its] burden of proof, the plaintiff must establish with reasonable certainty injury, a causal connection between the conduct complained of and the injury, and the appropriate compensation."  *Id.*, 192 Mich. App. at 350.  (Citation omitted.)  In this case, there is a lack of evidence tying any defect in the Connectors, or any other causal factor, to specific leaks.  There is also evidence of possible causes for the leaks unrelated to the Connectors (i.e., errors in the installation process, open plug holes, corrosion and damage by other trades).  Where the evidence, "clearly establishes many possible causes of alleged damages to plaintiff other than failure of the [product at issue],…[t]he existence of other and equally plausible causes must, as a matter of law, defeat recovery by the plaintiff…."  *U. S. Fibres, Inc. v. Proctor & Schwartz, Inc.*, 358 F. Supp 449, 466 (E.D. Mich. 1972).

Even if defects in the Connectors damaged Pace, Pace may not recover because its claimed damages are excessive.  Under the UCC, Pace can only recover losses or expenses that were "reasonably incurred."  MCL 440.2715(1).  Pace's expenditure of approximately 910 man-hours to repair 28 leaks was not reasonable.  It took only 2093 hours to install 165 panels from start to finish.  According to Pace, the

10

repair work was time consuming because when the leaks were discovered, the University had occupied the building and Pace had to work around the occupants, furniture, *etc.*  That excessive time could have been avoided had Pace tested and inspected the panels as Pace progressed through the installation, as the Project specifications and common sense required.  Pace has not shown its damages are reasonable.

Defendant has asserted a counterclaim in this matter seeking reimbursement of certain costs and expenses that it incurred.  This Court finds no legal basis upon which Mestek can recover these expenses.  For example, Mr. O'Rourke testified that Mestek paid American Scientific to train Pace's employees on installation.  Mr. O'Rourke acknowledged that this training was not part of his contract.  Further, he testified that he never asked Pace to reimburse for the training prior to filing the counterclaim.   Training was promised by the panel supplier, not Pace.  It is clear the panel supplier offered training to allay the concerns of Mr. Timmons, the owner's representative; thereby paving the road for acceptance of the proposed "flex-connectors".  With respect to other expenses claimed by Mestek, Mr. O'Rourke testified he has not paid Twa Panel Systems any monies and only began assembling these amounts after the Complaint was filed.   It is clear there is no express contract in place between the parties for the payment of these expenses and this Court finds insufficient basis to hold there is an implied contract.

The parties acknowledge that Mr. O'Rourke amended the Purchase Order Terms and Conditions to provide "prevailing party in any litigation gets attorney fees".  This modification passed without objection by Pace and therefore became part of the contract

between Pace and Mestek.  This Court finds Mestek to be the prevailing party and awards

attorney fees in an amount to be determined at a hearing to be held in the future.

Conclusion

For the reasons set forth herein, the Court finds in favor of Defendant Mestek on

the claim filed by Plaintiff Pace, and in favor of Counter-Defendant Pace on the

counterclaim filed by Mestek.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  September 22, 2005


I hereby certify that a copy of the foregoing document was served upon counsel of
record on September 22, 2005, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager